UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER LEE,                                    Case No. 09-10723

           Plaintiff,                    Avern Cohn
vs.                                                 United States District Judge

THOMAS BIRKETT, et al.,                             Michael Hluchaniuk
                                                    United States Magistrate Judge

           Defendants.
_____/

# REPORT AND RECOMMENDATION
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Dkt. 24, 51)

## I.    PROCEDURAL HISTORY

This is a prisoner civil rights action filed on February 26, 2009. (Dkt. 1).

Plaintiff alleges that defendants failed to provide sanitary prison conditions which

posed a threat to his health in violation of his constitutional rights. The events that

are the subject of plaintiff's original complaint occurred in 2007. This case was

referred to the undersigned by District Judge Avern Cohn on April 30, 2009, for all

pretrial purposes. (Dkt. 9).

Defendants, employees of the Michigan Department of Corrections (MDOC)

filed motions for summary judgment on July 2, 2009 and August 18, 2009. (Dkt.

24, 51). Plaintiff filed a response to the first motion on August 28, 2009. (Dkt.

56). In his response to the Court's order requiring him to respond to the second

motion for summary judgment, plaintiff says that "my rule 56(f) affidavit in opposition to the Defendants' 56(b) motion...is in support of my response to the Defendants motion to stay discovery, also." (Dkt. 61). He says he mailed this affidavit on August 26, 2009. (Dkt. 61). The Court received an affidavit from plaintiff on August 28, 2009, along with his "final" response to defendants' first motion for summary judgment, which appears to be the affidavit plaintiff identified in Dkt. 61. (Dkt. 58). Plaintiff has not filed any other response to the second motion for summary judgment.

Plaintiff was permitted to file an amended complaint, which he filed on January 26, 2010. (Dkt. 105). Plaintiff was not permitted to amend his claims against the moving defendants. (Dkt. 100). The claims made in the amended complaint against the moving defendants appear to be substantially the same as those in the original complaint. Therefore, the undersigned suggests that it is appropriate to address the motions for summary judgment even though they were filed before the now controlling amended complaint. This is matter is now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that defendants' motions for summary judgment be **GRANTED** and that plaintiff's claims against the moving defendants be **DISMISSED** with prejudice.

## II.    STATEMENT OF FACTS

Plaintiff claims that he was subjected to unsanitary prison conditions while confined in administrative segregation at Standish Maximum Correctional Facility (SMF) during the timeframe of October 10, 2007 (when he arrived at SMF) through approximately December 12, 2007, and that the conditions posed an unreasonable substantial risk of serious harm.  Plaintiff was transferred out of SMF to another facility in March, 2009.  He claims that he was denied sanitary cleaning supplies, including a mop to clean his cell, and was denied sanitary razor blades, which he claims were replaced monthly and all stored in a common cabinet, including those used by prisoners with MRSA.  Plaintiff also claims that he was subjected to retaliation and deliberate indifference as a result of filing complaints and grievances, by his continued confinement in administrative segregation. Plaintiff seeks approximately $500,000 punitive and compensatory damages, as well as declaratory and injunctive relief.  The defendants are SMF Warden Thomas Birkett; Assistant Deputy Warden Donald Ricumstrict; Assistant Deputy Warden Cary Walker; Assistant Resident Unit Supervisor (now at Saginaw Correctional Facility) Carolle Walker; Resident Unit Manager Michael Krajnik; Health Unit Manager Karen Peters; and, Deputy Warden of Saginaw Correctional Facility O'Bell T. Winn, and Regional Prison Administrator James McMeekin.

Defendants deny that conditions at SMF pose a health hazard in any respect and offer documentary and testimonial evidence in support of their motions. All prisoner cells are cleaned and disinfected whenever one prisoner vacates, prior to a new prisoner moving in. (Dkt. 24-6, p. 3). In addition, prisoners may further clean their own cells; they are given that opportunity twice a week. (Dkt. 24-6, p. 3). Not every prisoner cleans his cell twice a week. There are eight buckets for the 22 cells in each unit. (Dkt. 24-6, p. 3). Staff fill the buckets with water and disinfectant. Prisoners in segregation, like plaintiff, cannot, for security reasons, have mops, but can use the bucket of water and a sponge. (Dkt. 24-3, p. 3). Typically, one bucket of water is shared by two prisoners, but if the water is dirty, staff will empty and refill the bucket, adding more disinfectant. (Dkt. 24-6, p. 3). In addition to the sponge and bucket disinfectant, prisoners are allowed use of a dustpan and broom for their floors.

Razors are labeled with each prisoner's cell number, and are kept in a "razor box" (storage cabinet) also labeled by cell number. (Dkt. 24-6, p. 5). New razors are provided every two weeks in the segregation unit, and the razor box is sanitized and disinfected before the new razors are put in. (Dkt. 24-6, pp. 4-5). A prisoner has the option of purchasing a new razor with a hygiene ticket every time he showers. (Dkt. 24-6, p. 5). Razors used by quarantined prisoners are disposed of immediately and never placed in the razor box. (Dkt. 24-6, p. 4; Dkt. 24-3, p. 3).

Prisoners diagnosed with active MRSA are quarantined immediately. (Dkt. 24-6, p. 5). Quarantine means the prisoner is confined to his cell, meals are given in the cell, and there is no contact with others. (Dkt. 24-8, p. 5). Quarantined prisoners are given showers daily, and staff disinfect the shower afterwards. All clothing, bedding, and bathing linens are laundered daily. (Dkt. 24-8, p. 6). After the quarantine is lifted, the cell and all its furnishing are thoroughly cleaned and sanitized; prisoners who are required to do that cleaning must be trained in the biohazard clean up process. (Dkt. 24-8, p. 6).

Warden Birkett states in his affidavit that, in 2007, SMF was re-accredited for the sixth time by the American Corrections Association (ACA). (Dkt. 24-3). To be accredited, some 500+ standards must be met; 100% compliance is mandatory of some 63 standards. (Dkt. 24-3). SMF passed all the mandatory standards with 100% compliance, and its overall score was 99.05%. (Dkt. 24-3). That score was the highest of all the six ACA scores, and believed to be the highest score in the state. (Dkt. 24-3).

Defendants deny that plaintiff's continued segregation status was in retaliation for prior lawsuits and grievances filed concerning his conditions of confinement. (Dkt. 24-3, p. 5). Plaintiff states in this complaint that "CLAIMS #5 and #6 (having to do with his continued confinement in administrative segregation) IS [sic] A CONTINUANCE OF RETALIATION AND THE PROCEDURAL

DUE PROCESS RIGHTS VIOLATION EVOLVED [sic] FROM CIVIL RIGHTS CASE , CASE NO. 2:07-cv-60." Warden Birkett attests that plaintiff's behavior is the sole reason for his continued confinement. (Dkt. 24-3, pp. 5-6). In his view, a longer period of positive behavior by plaintiff is warranted. *Id*. Plaintiff's history of misconduct is significant. As set forth in a recent decision the Western District of Michigan, it was noted that after 18 months of avoided misconduct tickets, plaintiff began getting them again in late 2005:

> Plaintiff was reclassified to administrative segregation on November 14, 2003, at which time he had 165 major misconduct convictions. Since November 14, 2003, Plaintiff has been convicted of 22 additional misconducts, 14 of which were non-bondable. After the serious assaults on staff on March 26, 2004, Plaintiff avoided getting misconducts for approximately 18 months, after which he began getting misconduct tickets again.

*Bey v. Luoma*, 2008 WL 4534427, *7 (W.D. Mich. 2008). Plaintiff received four misconduct tickets in December 2005 and October 2006. (Dkt. 21-11).

Plaintiff was transferred to SMF on October 10, 2007. (Dkt. 24-3). Before his transfer, defendant McMeekin interviewed plaintiff on August 10, 2006 and May 1, 2007. (Dkt. 52, p. 3). A request for administrative segregation continuance had been submitted by the Security Classification Committee and approved by McMeekin. On arrival at SMF, plaintiff was apparently placed into administrative segregation immediately. Within weeks, he began filing grievances. At issue in

this lawsuit are the grievances plaintiff filed on October 25, 2007, October 26, 2007, November 13, 2007, March 26, 2008, January 1, 2008, January 9, 2008, and July 16, 2008. Defendants admit that a recommendation was made on December 13, 2007, approximately two months after plaintiff's arrival at SMF, that plaintiff be reclassified to general population. (Dkt. 24-3). Defendants Birkett and McMeekin also admit that they did not approve the reclassification. *Id.* According to defendant Birkett, the decision to approve plaintiff's administrative segregation was based on plaintiff's behavior and a determination that he required a longer period of positive behavior. *Id.* McMeekin interviewed plaintiff again on November 20, 2007 because his approval for reclassification from administrative segregation had been denied. (Dkt. 52, p. 4). Contrary to plaintiff's assertion, McMeekin explains that based on earlier behavior of assaulting staff and causing serious physical injury, plaintiff's reclassification to general population was denied. *Id.* McMeekin noted that, during the interview, plaintiff was argumentative and resistant to a reasonable discussion of his progress. *Id.* After another personal interview on March 20, 2008, McMeekin requested a continuance of administrative segregation. According to McMeekin, this decision was based on an assessment of plaintiff's behavior and attitude, an evaluation of his potential to honor the trust implicit in a less restrictive environment, and his history of assaulting staff and other serious misconduct. (Dkt. 52, p. 4). As of May 29, 2009,

plaintiff had 177 misconduct convictions. Plaintiff managed to avoid misconduct tickets while in administrative segregation at SMF. After his transfer from SMF in March, 2009, between March 11, 2009 and May 29, 2009, plaintiff was convicted of seven major misconducts: two charges of disobeying a direct order, four charges of threatening behavior, and a charge of sexual misconduct. (Dkt. 24-11, 24-12, 24-13, 24-14, 24-15).

## III. ANALYSIS AND CONCLUSIONS

### A. Standard of Review

Summary judgment is appropriate under Rule 56(b) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476, 478-79 (6th Cir. 1995), the court stated the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

"In deciding a motion for summary judgment, [the] court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). This is not to say that some credibility determinations are beyond what is appropriate in deciding a motion for summary judgment. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1774, 1776 (2007).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (citation omitted). Moreover, affidavits must meet certain requirements:

> A supporting or opposing affidavit must be made on
> personal knowledge, set out facts that would be
> admissible in evidence, and show that the affiant is

> competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1).  In accordance with Rule 56(e), the Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir. 1993).  Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-969 (6th Cir. 1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-226 (6th Cir. 1994).  *See Tolliver v. Federal Republic of Nigeria*, 265 F.Supp.2d 873, 879 (W.D. Mich. 2003).  Thus, "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."  *Id*., quoting, *Sperle v. Michigan Dept. of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002) (citation and quotation marks omitted).

    B.   <u>Deliberate Indifference</u>

Plaintiff must satisfy both an objective and subjective test to establish a constitutional deprivation. To meet the objective prong, a plaintiff must demonstrate that he has been incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Healthcare defendants do not appear to dispute that plaintiff's claims satisfy the objective prong of this test. (Dkt. 29, pp. 13-14). The objective component is often described as the denial of "the minimal civilized measure of life's necessities." *Berryman v. Johnson*, 1991 WL 150808 (6th Cir. 1991), quoting, *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). In this context, the Eighth Amendment protects against prison conditions that threaten to cause health problems in the future, not just those that cause immediate harm. *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (holding that prisoner stated a cause of action under Eighth Amendment by alleging that prison officials had, with deliberate indifference, exposed him to levels of environmental tobacco smoke that posed an unreasonable risk of serious damage to his future health). To meet this objective standard, however, "the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary

standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36 (emphasis in original).

Generally, unsanitary conditions may violate the Eighth Amendment's prohibition on subjecting inmates to an excessive risk of harm. For example, filthy cell conditions may constitute an Eighth Amendment violation. *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (Prisoner being placed in a cell covered with filth and human waste without proper cleaning supplies for two year period violates the Eighth Amendment.); *Coker v. Dallas County Jail*, 2007 WL 3022575, *20 (N.D. Tex. 2007) (Forcing prisoner to shower in area covered with blood and excrement falls within scope of conditions that violate Eighth Amendment). More specifically, exposure to bloodborne contagious or infectious diseases without proper protective equipment also satisfies the objective factor. *Randles v. Hester*, 2001 WL 1667821 (M.D. Fla. 2001). In *Randles*, the plaintiff alleged that the defendant forced him to clean up blood spills without furnishing him with available protective clothing and equipment, as described in the correctional facility's policies and procedures. *Id.* at *1-2. The court observed that there was a "consensus of United States Supreme Court decisions proscribing the exposure of inmates to contagious or infectious diseases and other obviously dangerous conditions likely to produce future harm." *Id.* at *1. *See e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982) (It is "cruel

and unusual punishment to hold convicted criminals in unsafe conditions."); *Gates, supra*, approved by the United States Supreme Court in *Helling, supra* ("The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event."). In *Randles*, the plaintiff argued, and the court agreed, that the defendant's written policy whose purpose was to prevent exposure to bloodborne diseases tended to establish that his work, where he was so exposed, presented an objectively excessive risk. *Id*. at *3; *see also Randles v. Singletary*, 2001 WL 1736881, *2 (M.D. Fla. 2001) (Exposure to blood is a substantial risk of harm).

In order to defeat summary judgment, a plaintiff must also, however, satisfy the second prong of the *Farmer* test, which is a subjective one, requiring the plaintiff to demonstrate that the defendants acted with deliberate indifference. To meet this prong, a plaintiff must show that: 1) a prison official knew of and disregarded an excessive risk to inmate health or safety; 2) the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm exists; and 3) the official also drew the inference. *Farmer*, 511 U.S. at 837. Thus, "deliberate indifference describes a state of mind more blameworthy than negligence," and requires "more than ordinary lack of due care for prisoner's interests or safety." *Id*. at 835 (citations omitted). "Deliberate indifference" has been variously defined by the federal courts that have considered prisoners' Eighth

Amendment claims, but all agree that it is *more* than mere negligence and *less* than actual intent in the form of "malicious" or "sadistic" action. *Farmer*, 511 U.S. at 861; *see also Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (deliberate indifference is the equivalent of "criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm"). Only an excessive force claim requires a showing of malicious and sadistic use of force. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Plaintiff may establish the subjective factor in several ways. As the Supreme Court explained, whether "a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation omitted).

Plaintiff asserts that he was only given half of a dirty sponge and dirty water to clean his cell. In support of their motion for summary judgment, defendants offer documentary and testimonial evidence regarding the cleaning procedures and policies in place at the SMF facility, as set forth in detail above. In rebuttal, plaintiff claims that he contracted a skin infection on his hand from the dirty bucket of cleaning water. Plaintiff's claim has two fatal flaws. First, he offers no evidence that his skin infection was actually caused by the bucket of cleaning

water.  Second, his complaints of skin infections involve events and grievances that are not at issue in this case, as they occurred in 2009, long after the events and grievances at issue in this case.  Thus, the undersigned suggests that plaintiff has failed to come forth with any evidence to establish a genuine issue of material fact on his claim of that unsanitary cell conditions posed an unreasonable risk of harm.

Plaintiff also makes a claim that he was subjected to an unreasonable risk of harm based on the shaving razor storage policy at SMF and by staff's failure to follow this policy (i.e., giving him and other prisoners the wrong razors), exposing him to MRSA and other infectious diseases.  Defendants explained in detail their razor storage policy for prisoners in administrative segregation.  Razors are labeled with each prisoner's cell number and are kept in a "razor box" (storage cabinet) also labeled by cell number.  (Dkt. 24-6, p. 5).  New razors are provided every two weeks in the segregation unit, and the razor box is sanitized and disinfected before the new razors are put in.  (Dkt. 24-6, pp. 4-5).  A prisoner has the option of purchasing a new razor with a hygiene ticket every time he showers.  (Dkt. 24-6, p. 5).  Razors used by a quarantined prisoners are disposed of immediately and never placed in the razor box.  (Dkt. 24-6, p. 4; Dkt. 24-3, p. 3).  Prisoners diagnosed with active MRSA are quarantined immediately.  (Dkt. 24-6, p. 5).  Quarantine means the prisoner is confined to his cell, meals are given in the cell, and there is no contact with others.  (Dkt. 24-8, p. 5).  Quarantined prisoners are given showers

daily, and staff disinfect the shower afterwards. All clothing, bedding, and bathing linens are laundered daily. (Dkt. 24-8, p. 6). After the quarantine is lifted, the cell and all its furnishing are thoroughly cleaned and sanitized; prisoners who are required to do that cleaning must be trained in the biohazard clean up process. (Dkt. 24-8, p. 6).

Plaintiff does not offer any evidence to show that the SMF policy regarding MRSA was inadequate or unreasonably exposed him to a risk of infection. Based on the foregoing, the undersigned suggests that plaintiff has failed to establish any issue of material fact that the SMF policy, as stated or in practice, regarding prisoners with MRSA ever posed an unreasonable risk of harm to him.

The undersigned also suggests that plaintiff has not established any material factual dispute that the razor storage policy posed an unreasonable risk of harm to him. Plaintiff makes two arguments. First, he says that storing used razors together as was done at SMF presents an obvious hazard of cross-contamination with the skin, blood, and germs that are on the razors. He does not, however, offer any evidence that this is the case and fails to rebut the evidence submitted by defendants that the policy does not present an unreasonable risk of harm, given the sanitizing of the storage box on a regular basis, the capping of all razors, and the labeling of each razor with a prisoner identification.

Second, plaintiff argues that he was exposed to an unreasonable risk of harm when staff gave him the wrong razor. In support of his claim, he also points to an incident where this happened to another prisoner. The undersigned suggests that even if such an occasional error could satisfy the objective prong of the deliberate indifference standard (which is doubtful), plaintiff has offered no evidence that any defendant had a state of mind "more blameworthy than negligence," or whose actions constituted "more than ordinary lack of due care for prisoner's interests or safety." *Farmer*, 511 U.S. at 835. At best, plaintiff's claim suggests mere negligence. Thus, the undersigned suggests that plaintiff has failed to establish a genuine issue of material fact as to his claim that giving him the incorrect razor on one occasion constituted deliberate indifference.

C.    Retaliation

A prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974). Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To establish a First Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from

Report and Recommendation
Motions for Summary Judgment
*Lee v. Birkett*; 09-10723

continuing to engage in that conduct; and (3) that this adverse action was taken at least in part because of the exercise of the protected conduct. *Id*. "[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one." *Id*. at 395. Moreover, the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff is able to make such a showing, the defendant then has the burden of showing that the same action would have been taken even absent the plaintiff's protected conduct. *Id.*; *Thaddeus-X*, 175 F.3d at 399.

Plaintiff claims that his continued confinement in administrative segregation is the result of his protected conduct in filing grievances and lawsuits. Defendants deny that plaintiff's use of the grievance system or his legal actions are the reason for his continued placement in administrative segregation. Plaintiff filed his grievances on October 25, 2007, October 26, 2007, November 13, 2007, March 26, 2008, January 1, 2008, January 9, 2008, and July 16, 2008. Defendants admit that a recommendation was made on December 13, 2007 that plaintiff be reclassified to general population. (Dkt. 24-3). Defendants Birkett and McMeekin also admit that they did not approve the reclassification. *Id*. According to defendant Birkett, the decision to approve plaintiff's administrative segregation was based on

plaintiff's behavior and a determination that he required a longer period of positive behavior. *Id.* Defendant McMeekin interviewed plaintiff on August 10, 2006 and May 1, 2007. (Dkt. 52, p. 3). McMeekin interviewed plaintiff again on November 20, 2007 because his approval for reclassification from administrative segregation had been based on earlier behavior of assaulting staff and causing serious physical injury. *Id.* McMeekin noted that, during the interview, plaintiff was argumentative and resistant to a reasonable discussion of his progress. *Id.* After another personal interview on March 20, 2008, McMeekin requested a continuance of administrative segregation. According to McMeekin, this decision was based on an assessment of plaintiff's behavior and attitude, an evaluation of his potential to honor the trust implicit in a less restrictive environment, and his history of assaulting staff and other serious misconduct. (Dkt. 52, p. 4).

Plaintiff's history of serious misconduct is significant. As of May 29, 2009, plaintiff had 177 misconduct convictions. As set forth in a recent decision the Western District of Michigan, it was noted that after 18 months of avoiding misconduct tickets, plaintiff began getting them again in late 2005:

> Plaintiff was reclassified to administrative segregation on November 14, 2003, at which time he had 165 major misconduct convictions. Since November 14, 2003, Plaintiff has been convicted of 22 additional misconducts, 14 of which were non-bondable. After the serious assaults on staff on March 26, 2004, Plaintiff avoided getting misconducts for approximately 18

> months, after which he began getting misconduct tickets
> again.

*Bey v. Luoma*, 2008 WL 4534427, *7 (W.D. Mich. 2008).  Plaintiff managed to

avoid misconduct tickets for approximately 18 months while in administrative

segregation at SMF.  However, after his transfer from SMF in March, 2009,

plaintiff was convicted of seven major misconducts between March 11, 2009 and

May 29, 2009: two charges of disobeying a direct order, four charges of

threatening behavior, and a charge of sexual misconduct-exposure.  (Dkt. 24-11,

24-12, 24-13, 24-14, 24-15).

Defendants assert that based on the above, plaintiff was kept in

administrative segregation for a legitimate reason and that plaintiff's filing of

grievances and lawsuits was neither a substantial or a motivating factor in the

decision to continue plaintiff in administrative segregation.  Given plaintiff's

history, defendants made a reasoned decision that a longer period of positive

behavior was required before plaintiff could be placed in general population.  The

undersigned suggests, therefore, that defendants have adequately shown that

plaintiff's continued incarceration in administrative segregation was not the result

of retaliatory animus.

D.    Sixth Amendment

Plaintiff mentions a violation of the Sixth Amendment in his complaint, but as defendants point out, the Sixth Amendment applies only to criminal cases and does not apply to claims under § 1983.  In the context of § 1983, the Sixth Amendment right to the assistance of counsel in a criminal case could be implicated where an inmate is denied "meaningful access" to the courts, which includes a reasonable opportunity to communicate with an attorney.  *See Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (The Supreme Court has held that the concept of "meaningful access" encompasses the reasonable opportunity to communicate with an attorney.).  However, nothing in plaintiff's complaint or other filings in this case appears to implicate his right to access to courts with respect to a criminal matter.  Moreover, plaintiff appears to have abandoned this claim, having not addressed it in his extensive responses to defendants' motions for summary judgment.  *See Anglers of the Au Sable v. U.S. Forest Service*, 565 F.Supp.2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment  may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.").

Report and Recommendation
Motions for Summary Judgment
*Lee v. Birkett*; 09-10723

E.    Declaratory/Injunctive Relief

When a prisoner sues for equitable relief and, by virtue of a transfer to another prison, is no longer under the control or custody of the defendants, his claims for injunctive and declaratory relief are moot. *Kime v. Jones*, 2007 WL 586793, *3 (W.D. Mich. 2007), citing, *Mowatt v. Brown*, 902 F.2d 34, 1990 WL 59896 (6th Cir. 1990); *Tate v. Brown*, 902 F.2d 35, 1990 WL 58403 (6th Cir. 1990); *Howard v. Heffron*, 884 F.2d 1392, 1989 WL 107732 (6th Cir. 1989); *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991). "Underlying the rule is the premise that injunctive relief is appropriate only where plaintiff can show a reasonable expectation or demonstrated probability that he is in immediate danger of sustaining direct future injury as the result of the challenged official conduct." *Kime* at *3 (citing, *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *see also, Brieger v. Teletronics, Inc.*, 816 F. 2d 678, 1987 WL 37131 (6th Cir. 1987) (injunctive relief generally inappropriate where remedy at law, i.e., money damages, is available). Indeed, prior "exposure to an isolated incident of illegal conduct does not, by itself, sufficiently prove that the plaintiff will be subjected to the illegal conduct again." *Kime*, at *3 (collecting cases). Finally, a court should assume that, "absent an official policy or practice urging unconstitutional behavior, individual government officials will act constitutionally." *Id*. As noted above,

plaintiff was transferred to another correctional facility in March, 2009.  Therefore, his claims for injunctive and declaratory relief are moot.

F.    Qualified Immunity

Defendants claim to be entitled to qualified immunity regarding their actions in this case.  The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992), quoting, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing defendants are not entitled to qualified immunity.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

The Supreme Court had established a two-part test in order to determine whether qualified immunity was applicable to a particular situation.  *Saucier v. Katz*, 533 U.S. 194 (2001).  The first part of the test involved a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right."  *Id*. at 201.  If the first question was resolved in the affirmative then the court would decide "whether the

right was clearly established." *Id*.  If both questions are resolved in the affirmative,

then the doctrine of qualified immunity does not apply and the case can proceed.

Recently, the Supreme Court revisited their decision in *Saucier* and

concluded that mandatory order of the two part test for determining if qualified

immunity applied was no longer sound based on several factors including judicial

economy.  *Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808 (2009).  While not

modifying the factors that should be considered in such a decision, the Court held

that sometimes it makes sense to allow the second part of the test to be decided

first and that such a decision may resolve the controversy without having to

address the first part of the test.  In *Pearson*, the § 1983 claim of the plaintiff was

based on an allegedly unlawful search conducted by the defendant police officers.

Without having to engage in the perhaps more complicated decision of determining

whether plaintiff's constitutional rights had been violated, the Court found that the

constitutional right claimed by plaintiff was not clearly established where lower

court case law was consistent with the conduct of the officers and "principles of

qualified immunity [should] shield an officer from personal liability when an

officer reasonably believes that his or her conduct complies with the law."

*Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (When "the legal

question of immunity is completely dependent upon which view of the facts is

accepted by the jury," the "jury becomes the final arbiter of [a] claim of

immunity."); *Bouggess v. Mattingly*, 482 F.3d 886, 888 (6th Cir. 2007). Given the foregoing recommendations regarding the claims against the moving defendants and the conclusion that they did not violate plaintiff's constitutional rights, defendants are entitled to qualified immunity.

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that defendants' motions for summary judgment be **GRANTED** and that plaintiff's claims against the moving defendants be **DISMISSED** with prejudice.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Administrative Order 09-AO-042. The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 18, 2010        s/Michael Hluchaniuk      
                              Michael Hluchaniuk
                              United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on February 18, 2010, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: Christine Campbell, and I certify that I have mailed by United States Postal Service the foregoing pleading to the plaintiff, a non-ECF participant, at the following address: Christopher Lee, # 236321, BARAGA MAXIMUM CORRECTIONAL FACILITY, 13924 Wadaga Road, Baraga, MI, 49908-9204.

                              s/Tammy Hallwood      
                              Case Manager
                              U.S. District Court
                              600 Church Street
                              Flint, MI 48502
                              (810) 341-7887
                              tammy_hallwood@mied.uscourts.gov